IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 4:18-CR-3154 |
| vs. | |
| ALEC RAMSEY EILAND, | MEMORANDUM AND ORDER |
| Defendant. | |

This matter is before the Court on the defendant's objection ([filing 37](filing 37)) to the Magistrate Judge's Findings, Recommendation and Order ([filing 35](filing 35)) that the defendant's motion ([filing 24](filing 24)) to suppress his statements and the evidence resulting from the search and seizure of his phone be denied. Pursuant to [28 U.S.C. § 636(b)(1)](28 U.S.C. § 636(b)(1)), the Court has conducted a de novo review of the motion to suppress, and the evidence and testimony adduced at the hearing on the motion. For the reasons stated below, the Court finds that the statements made by the defendant on November 7, 2018, and any evidence derived from the later seizure and search of his cellphone, should be suppressed. Accordingly, the Court will sustain the defendant's objection and grant his motion to suppress.

I. BACKGROUND

On November 7, 2018, the defendant, 19-year-old Alec Eiland, was living in an apartment near 70th and Adams Streets in Lincoln. He was a recent graduate of Waverly High School. That afternoon, the defendant was leaving his apartment after taking his lunch break from his job at Russ' Market. He got into his car and started it when he noticed someone walking up from

behind. Filing 36 at 69. The person came up to his car, knocked on the window, and asked if he was Alec Eiland. The defendant said yes. The person identified himself as FBI Special Agent Brandon Day and asked the defendant to step out of his car. Filing 36 at 69. Agent Day patted the defendant down, took his cellphone and placed it on the defendant's car, and told the defendant that he had to hold him there until a couple of agents from Omaha arrived. Filing 36 at 70. The defendant asked if he could use his cellphone to call his employer to say he was going to be late getting back to work. Agent Day said no, but Day used his own cellphone to call the defendant's employer. Agent Day handed his phone to the defendant, and told him to tell his employer he was having car problems and would be a few minutes late. Filing 36 at 71.

The defendant estimated that he waited with Agent Day for 10 to 15 minutes before two more agents arrived. The defendant said that he and Day engaged in small talk during the wait. When Special Agents John Hallock and Jonathan Robitaille arrived, they got out of their car with a recorder and asked the defendant if they could ask him some questions. Filing 36 at 72. Before the recording started, the defendant was told that it would help if he was cooperative, but if he was uncooperative it would make the situation worse. Filing 36 at 72. At the suppression hearing, Agent Hallock could not describe what was said before the recording started, but agreed that there was some conversation, which he characterized as "small talk of some sort." Filing 36 at 42. The recording itself indicates that before the recording began, the agents told the defendant this was his opportunity to tell his side of the story. Ex. 1 at 1:26.

The recorded interview started with Agent Hallock reading *Miranda* warnings to the defendant. Filing 36 at 9; Ex. 1 at 0:27-1:16. Hallock then asked the defendant to sign a waiver form, but the defendant balked and said,

2

"All right, so this is me signing without a lawyer?" Ex 1 at 1:16. Agent Hallock acknowledged that it was, and the defendant replied, "So what if I want a lawyer?" Ex. 1 at 1:21. Agent Hallock said, "That's up to you." The defendant started to respond, "Well, I'd feel more comfortable . . " but Hallock interrupted him:

> HALLOCK: Remember what we—well, remember what we talked—remember what we talked about . . .
> EILAND: Okay
> HALLOCK: about, you know, getting a chance to tell your side of the story today.

Ex. 1 at 1:26

The defendant told Agent Hallock he was concerned that if he told his side of the story he would get in trouble. Hallock told him it was hard to say what would happen and that it would be up to the prosecutor. After five seconds of silence, Agent Robitaille said, "Just your opportunity to say your side of the story." Ex. 1 at 1:46. The defendant expressed his concern about incriminating himself if he participated without a lawyer.

> EILAND: Yeah, but I don't want to say anything incriminating. I don't want to ruin my whole life because of one mistake.
> HALLOCK: I don't know if it will ruin your whole life. You're a young man. You have no criminal history.
> EILAND: Yeah
> HALLOCK: Is that correct, or have you been in trouble?
> EILAND: No.

3

> HALLOCK: Again, read over that, and you decide what you want to do.

Ex. 1 at 1:48.

The defendant then said, "I'd feel more comfortable with a lawyer or at least my dad." Ex. 1 at 2:15. The defendant was asked where his dad was, and he said in Waverly. After another pause, the defendant repeated he would feel more comfortable with somebody there to help him.

> EILAND: I mean I know I would feel comfortable with somebody. I mean, I totally want to help you guys and tell you my whole side of the story and everything that happened, but I don't feel comfortable because I don't wanna self-incriminate myself and possibly go to jail or something regarding a mistake.
> HALLOCK: It's up to you. Do you want to read over that and decide what you want to do.
> ROBITAILLE: We've heard the other side of the story, that's all we have right now—so . . .

Ex. 1 at 2:24.

After another five seconds of silence, the defendant said, "I would rather have a lawyer. I'm sorry guys." Agent Hallock told him he didn't have to be sorry, it was his right to request counsel, and stopped recording. Ex. 1 at 3:02. At the suppression hearing, Hallock acknowledged that the defendant's statement indicated he wanted to invoke his *Miranda* rights. Filing 36 at 47.

Although Hallock stopped recording, his conversation with the defendant did not stop. Hallock could not recall exactly what he said, but he believed he would have told the defendant that there would be an opportunity

for him to tell his side of the story if he is charged, and that cooperative defendants compared to uncooperative defendants may get some type of consideration. Filing 36 at 13-14. The defendant recalled that after he told the agents he was sorry, one of them said in a raised voice, "That's all right, but this is going to end tonight." Filing 36 at 76. Agent Hallock agreed that he did not tell the defendant that he could leave after he invoked his right to counsel. Filing 36 at 46. The defendant said that his cellphone was not returned when Hallock stopped recording. Filing 36 at 76-77.

Hallock said that after he turned the recorder off, the defendant reinitiated contact and wanted to talk. Filing 36 at 14. When asked if his comments after stopping the recording were intended to get the defendant to make a statement, Hallock said, "No, it was to assist him in the process, I believe." *Id.* The defendant said there was about a two-minute gap between when the first recording ended and when he agreed to a second recorded interview. Filing 36 at 75. Hallock began the second recording by giving the defendant his *Miranda* rights again, which the defendant waived. Ex. 2 at 1:02-1:43. Hallock started questioning the defendant about cyberstalking allegations. Ex. 2 at 2:46. The defendant told Hallock that he posted a private, personal story on Snapchat, but was interrupted and asked what he used to do his postings.

> ROBITAILLE: On what device?
> EILAND: My iPhone.
> ROBITAILLE: iPhone that we have right now?
> EILAND: Yep, right over there.
> ROBITAILLE: Okay.
> HALLOCK: Do you use your phone—do you use your phone for all your postings or do you use a computer?

> EILAND: I use my phone.
>
> HALLOCK: Your phone is everything, okay, so all the—all the—so all the social media stuff you do is through your phone?
>
> EILAND: Okay.
>
> HALLOCK: Okay.

Ex. 2 at 5:10-5:29.

Hallock asked the defendant for his consent to allow the agents to look at his cellphone or download the data on his phone. Ex. 2 at 18:09. The defendant offered to give Hallock his emails, but Hallock told him they would need to take his cellphone for some time. Ex. 2 at 18:19. At the end of the second interview, the defendant consented to a search of his cellphone. He signed a consent and release form for his cellphone and was then placed under arrest. Filing 36 at 17.

## II. DISCUSSION

### 1. Custodial Interrogation.

The defendant's primary objection to the Magistrate Judge's findings (filing 37) concerns the conclusion that he was not under arrest or subjected to a custodial interrogation when he spoke with the agents. Filing 35 at 6. Agreeing with the Magistrate Judge, the Government argues that the encounter with the defendant occurred outdoor in a parking lot, and the defendant was not formally placed under arrest or physically restrained. Filing 42 at 6. But whether a person is seized by law enforcement does not depend on the formality of an official pronouncement of arrest, or physical restraints such as handcuffs, or whether the setting was indoor or outdoor. A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when an officer, by means of physical force *or show of*

*authority*, intentionally terminates or restrains the person's freedom of movement, and the person actually submits to the physical force or show of authority. *Brendlin v. California*, 551 U.S. 249, 254 (2007).

The Court finds that the defendant submitted to Agent Day's show of authority when Day knocked on the defendant's car window, asked him to get out, patted him down, confiscated his cellphone, and told him he had to wait for two FBI agents traveling from Omaha to arrive so that he could be questioned. Further, the defendant acquiesced to Agent Day's show of authority when he relinquished his cellphone and obeyed Day when he was not allowed to call his employer on his own phone to report his delay. The defendant testified that during the course of both interrogations, he was standing at the front of a car surrounded by the agents who were within arms-length. Filing 36 at 78-79. The defendant said that he did not feel like he was free to leave. Filing 36 at 79.

Both Day and Hallock testified that in their view, the defendant was not in custody during the interviews. Filing 36 at 9, 57-58. The relevant inquiry is not based on the interrogator's perspective, but instead, based on how a reasonable person in the defendant's position would have understood the situation. *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017). The defendant was told by Agent Day that he could not leave, had his cellphone taken and not returned, and at all times was surrounded by agents who could reach out and grab him. No reasonable person would have thought they were free to get back into their car and drive off. Further, it appears that Agent Hallock knew, or at least was concerned, that the defendant was in custody when he started the first recording. Hallock read the defendant his *Miranda* rights, which are only required if the defendant was being subjected to custodial questioning. *See Giboney*, 863 F.3d at 1029. Although Hallock

7

testified that he read the defendant his rights out of caution (filing 36 at 9), he was likely cautious because he recognized that a reasonable person would think they were not free to get in their car and drive away. Based upon the Court's de novo review of the evidence, the Court concludes that Agent Hallock's questioning of the defendant was custodial.

2. Invocation of Right to Counsel

The defendant argues that he was subjected to a custodial interrogation without the benefits of *Miranda*. Filing 38 at 9. That, however, is a misstatement. Agent Hallock clearly read the standard *Miranda* warnings at the beginning of each recorded interview. Ex. 1 at 0:27; Ex. 2 at 1:02. The issue is whether the defendant invoked his right to the assistance of counsel. The recording of the first interview shows that when Hallock finished going through the *Miranda* warnings, he pressed the defendant to sign a waiver. Ex. 1 at 1:16. The defendant balked and said, "so this is me signing without a lawyer?" He next asked, "So what if I want a lawyer?" and Hallock responded "That's up to you." Ex. 1 at 1:21-24. The defendant clearly stated the reason he was concerned about answering Hallock's questions without a lawyer—self-incrimination. The defendant asked about having a lawyer or his dad present two more times before finally telling Hallock, "I would rather have a lawyer, I'm sorry guys." Ex. 1 at 3:02. Agent Hallock told the defendant he didn't have to be sorry, that it was his right to invoke the assistance of counsel, and stopped recording. Although Hallock testified he thought the defendant did not unequivocally invoke his right to counsel, it is clear from the recording and Hallock's reaction to what the defendant said, that Hallock understood the defendant had, in fact, invoked his right to counsel.

When the defendant requested the presence of counsel, the agents were required to cease the interrogation until an attorney was made available. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). The right to counsel is critical to our legal system because of the unique ability to protect a suspect's Fifth Amendment rights while undergoing custodial interrogation. *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). An accused, such as the defendant, who has invoked a right to deal with law enforcement authorities only through counsel, is not subject to further interrogation until counsel has been made available, unless the accused has initiated further communications or conversations with law enforcement. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

The Magistrate Judge concluded, and the Government argues, that after Agent Hallock stopped the initial recording, it was the defendant who initiated further conversation with the agents and indicated his willingness to answer questions. Filing 35 at 6; filing 42 at 10. However, the Supreme Court addressed this circumstance in a Fifth Amendment right to remain silent context and found it would lead to absurd and unintended results. *Michigan v. Mosley*, 423 U.S. 96, 102 (1975). Permitting the continuation of a custodial interrogation after a momentary cessation clearly would frustrate the purposes of *Miranda* and allow repeated questioning to undermine the will of the arrestee. *Id.*

The assumption that underlies the rule in *Edwards* is that there was a break in custody sufficient to dissipate the coercion inherent in police custody.

> The protections offered by *Miranda*, which we have deemed sufficient to ensure that the police respect the suspect's desire to have an attorney present the first time police interrogate him, adequately ensure that result when a suspect who initially

9

requests counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects.

*Maryland v. Shatzer*, 559 U.S. 98, 109 (2010). The Supreme Court found it valuable to draw a bright-line, and held that a 14-day break in custody would be sufficient to dissipate the coercive effects of a prior custodial interrogation where the right to counsel was invoked. *Shatzer*, 559 U.S. at 110.

Here, there was no break in custody before the defendant expressed his willingness to answer Agent Hallock's questions. Hallock does not recall telling the defendant that he was free to leave when he stopped recording, and Agent Day did not return the defendant's cellphone. Filing 36 at 46, 76. The defendant said that he never felt like he was free to leave, and believed that he would be arrested that night no matter what. Filing 36 at 75, 79. Upon de novo review of the evidence, the Court finds that the defendant's statements made in the second interview were not made after a break in custody sufficient to dissipate the coercive effect of his initial custodial encounter with the agents. The statements made in the second interview were without the assistance of counsel after the defendant unambiguously invoked his right to counsel. As such, the defendant's statements in the second interview were obtained in violation of his Fifth Amendment rights and are not admissible at trial.

### 3. Consent to Search Cellphone

In and of itself, a consent to search is not a statement that tends to incriminate the suspect, and is therefore outside of the privilege against self-incrimination. *See Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985). But the matter before this Court is not an ordinary consent to search case where consent was freely and voluntarily given. Here, the defendant's consent to search his cellphone, as well as the defendant's self-incriminating admission

that all his social media postings were on the iPhone that Agent Day had confiscated, were obtained after he invoked his Fifth Amendment right to deal with law enforcement through an attorney. The consent to search, and justification for the seizure of the defendant's cellphone were obtained in direct violation of his rights under *Miranda* and *Edwards*.

The presumption arising from *Edwards* is that when a suspect indicates that he or she is not willing to undergo custodial interrogation without a lawyer, any subsequent waiver that does not come at the suspect's own instigation is the product of the compelling pressure of custody and not the suspect's voluntary choice. *Arizona v. Roberson*, 486 U.S. 675, 681 (1988). Prolonged police custody and repeated interrogations pose a significantly greater risk of coercion. *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). "[T]hose subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial" *U.S. v. Patane*, 542 U.S. 630, 640 (2004).

Pursuant to the rule in *Edwards*, here, the defendant did not voluntarily consent to give his cellphone to Agent Hallock, or voluntarily tell the agents that all of his social media postings were accomplished with his phone. His statement was taken, and the evidence derived from his statement was obtained, in violation of *Miranda, Edwards, Roberson, Minnick,* and *Shatzer*. To suppress his statement alone, but not the evidence derived from the search and seizure of his cellphone, would create an incentive for law enforcement to ignore the law. Specifically, this would create a disincentive for law enforcement to stop questioning a detainee if he or she could possibly be induced to reveal information leading to incriminating physical evidence that could be admitted in a subsequent criminal trial. *See U.S. v. Gilkeson*, 431 F.

11

Supp. 2d 270, 294 (N.D.N.Y. 2006); *see also U.S. v. Villa-Gonzalez*, 623 F.3d 526, 535 (8th Cir. 2010); *U.S. v. Johnson*, No. 5:14-CR-50028, 2014 WL 3573406, at 19-20 (D.S.D. July 21, 2014); *Commonwealth v. Lukach*, 195 A.3d 176, 193 (Pa. 2018); *State v. Harris*, 544 N.W.2d 545, 553-54 (Wis. 1996); *State v. Gravel*, 601 A.2d 678, 685 (N.H. 1991); *State v. Venegas*, 79 So. 3d 912 (Fla. Dist. Ct. App. 2012).

Upon de novo review of the evidence and arguments of the parties, the Court finds that the defendant did not voluntarily consent to the seizure or search of his cellphone. Based only on the record presently before the Court, all evidence derived from the seizure and search of the defendant's cellphone may not be used at trial.

IT IS ORDERED:

1. The Magistrate Judge's Findings, Recommendation and Order (filing 35) is not adopted.

2. Defendant's Motion to Suppress (filing 24) is granted, and as a result, all statements made after the defendant invoked his right to counsel and the contents of the cellphone search are suppressed.

3. Defendant's objection (filing 37) is sustained.

Dated this 1st day of July, 2019.

BY THE COURT:

_____
John M. Gerrard
Chief United States District Judge