IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | |
|---|---|
| Plaintiff, | 4:18-CR-3154 |
| vs. | MEMORANDUM AND ORDER |
| ALEC RAMSEY EILAND, | |
| Defendant. | |

This matter is before the Court on the government's motion for reconsideration (filing 45) of this Court's Memorandum and Order of July 1, 2019 (filing 44), in which this Court did not adopt the Magistrate Judge's Findings, Recommendation and Order (filing 35), but instead, granted the defendant's motion (filing 24) to suppress his statements and the evidence resulting from the search and seizure of his phone. The Court will deny the government's motion for reconsideration (filing 45) for the reasons that follow.

I. BACKGROUND

For context, the background reported by the Court in the Memorandum and Order of July 1 (filing 44 at 1-6) will be repeated below.

On November 7, 2018, the defendant, 19-year-old Alec Eiland, was living in an apartment near 70th and Adams Streets in Lincoln. He was a recent graduate of Waverly High School. That afternoon, the defendant was leaving his apartment after taking his lunch break from his job at Russ's Market. He got into his car and started it when he noticed someone walking up from behind. Filing 36 at 69. The person came up to his car, knocked on the window, and asked if he was Alec Eiland. The defendant said yes. The person identified

himself as FBI Special Agent Brandon Day and asked the defendant to step out of his car. Filing 36 at 69. Agent Day patted the defendant down, took his cellphone and placed it on the defendant's car, and told the defendant that he had to hold him there until a couple of agents from Omaha arrived. Filing 36 at 70. The defendant asked if he could use his cellphone to call his employer to say he was going to be late getting back to work. Agent Day said no, but Day used his own cellphone to call the defendant's employer. Agent Day handed his phone to the defendant, and told him to tell his employer he was having car problems and would be a few minutes late. Filing 36 at 71.

The defendant estimated that he waited with Agent Day for 10 to 15 minutes before two more agents arrived. The defendant said that he and Day engaged in small talk during the wait. When Special Agents John Hallock and Jonathan Robitaille arrived, they got out of their car with a recorder and asked the defendant if they could ask him some questions. Filing 36 at 72. Before the recording started, the defendant was told that it would help if he was cooperative, but if he was uncooperative it would make the situation worse. Filing 36 at 72. At the suppression hearing, Agent Hallock could not describe what was said before the recording started, but agreed that there was some conversation, which he characterized as "small talk of some sort." Filing 36 at 42. The recording itself indicates that before the recording began, the agents told the defendant this was his opportunity to tell his side of the story. Ex. 1 at 1:26.

The recorded interview started with Agent Hallock reading *Miranda* warnings to the defendant. Filing 36 at 9; Ex. 1 at 0:27-1:16. Hallock then asked the defendant to sign a waiver form, but the defendant balked and said, "All right, so this is me signing without a lawyer?" Ex 1 at 1:16. Agent Hallock acknowledged that it was, and the defendant replied, "So what if I want a

lawyer?" Ex. 1 at 1:21. Agent Hallock said, "That's up to you." The defendant started to respond, "Well, I'd feel more comfortable . . . " but Hallock interrupted him:

> HALLOCK: Remember what we—well, remember what we talked—remember what we talked about . . .
> EILAND: Okay
> HALLOCK: about, you know, getting a chance to tell your side of the story today.

Ex. 1 at 1:26

The defendant told Agent Hallock he was concerned that if he told his side of the story he would get in trouble. Hallock told him it was hard to say what would happen and that it would be up to the prosecutor. After five seconds of silence, Agent Robitaille said, "Just your opportunity to say your side of the story." Ex. 1 at 1:46. The defendant expressed his concern about incriminating himself if he participated without a lawyer.

> EILAND: Yeah, but I don't want to say anything incriminating. I don't want to ruin my whole life because of one mistake.
> HALLOCK: I don't know if it will ruin your whole life. You're a young man. You have no criminal history.
> EILAND: Yeah
> HALLOCK: Is that correct, or have you been in trouble?
> EILAND: No.
> HALLOCK: Again, read over that, and you decide what you want to do.

3

Ex. 1 at 1:48.

The defendant then said, "I'd feel more comfortable with a lawyer or at least my dad." Ex. 1 at 2:15. The defendant was asked where his dad was, and he said in Waverly. After another pause, the defendant repeated he would feel more comfortable with somebody there to help him.

> EILAND: I mean I know I would feel comfortable with somebody. I mean, I totally want to help you guys and tell you my whole side of the story and everything that happened, but I don't feel comfortable because I don't wanna self-incriminate myself and possibly go to jail or something regarding a mistake.
> HALLOCK: It's up to you. Do you want to read over that and decide what you want to do.
> ROBITAILLE: We've heard the other side of the story, that's all we have right now—so . . .

Ex. 1 at 2:24.

After another five seconds of silence, the defendant said, "I would rather have a lawyer. I'm sorry guys." Agent Hallock told him he didn't have to be sorry, it was his right to request counsel, and stopped recording. Ex. 1 at 3:02. At the suppression hearing, Hallock acknowledged that the defendant's statement indicated he wanted to invoke his *Miranda* rights. Filing 36 at 47.

Although Hallock stopped recording, his conversation with the defendant did not stop. Hallock could not recall exactly what he said, but he believed he would have told the defendant that there would be an opportunity for him to tell his side of the story if he is charged, and that cooperative defendants compared to uncooperative defendants may get some type of consideration. Filing 36 at 13-14. The defendant recalled that after he told the

4

agents he was sorry, one of them said in a raised voice, "That's all right, but this is going to end tonight." Filing 36 at 76. Agent Hallock agreed that he did not tell the defendant that he could leave after he invoked his right to counsel. Filing 36 at 46. The defendant said that his cellphone was not returned when Hallock stopped recording. Filing 36 at 76-77.

Hallock said that after he turned the recorder off, the defendant reinitiated contact and wanted to talk. Filing 36 at 14. When asked if his comments after stopping the recording were intended to get the defendant to make a statement, Hallock said, "No, it was to assist him in the process, I believe." *Id.* The defendant said there was about a two-minute gap between when the first recording ended and when he agreed to a second recorded interview. Filing 36 at 75. Hallock began the second recording by giving the defendant his *Miranda* rights again, which the defendant waived. Ex. 2 at 1:02-1:43. Hallock started questioning the defendant about cyberstalking allegations. Ex. 2 at 2:46. The defendant told Hallock that he posted a private, personal story on Snapchat, but was interrupted and asked what he used to do his postings.

> ROBITAILLE:   On what device?
> EILAND:      My iPhone.
> ROBITAILLE:   iPhone that we have right now?
> EILAND:      Yep, right over there.
> ROBITAILLE:   Okay.
> HALLOCK:     Do you use your phone—do you use your phone for all your postings or do you use a computer?
> EILAND:      I use my phone.
> HALLOCK:     Your phone is everything, okay, so all the—all the—so all the social media stuff you do is through your phone?

5

| | | |
|---|---|---|
| EILAND: | | Okay. |
| HALLOCK: | | Okay. |

Ex. 2 at 5:10-5:29.

Hallock asked the defendant for his consent to allow the agents to look at his cellphone or download the data on his phone. Ex. 2 at 18:09. The defendant offered to give Hallock his emails, but Hallock told him they would need to take his cellphone for some time. Ex. 2 at 18:19. At the end of the second interview, the defendant consented to a search of his cellphone. He signed a consent and release form for his cellphone and was then placed under arrest. Filing 36 at 17.

## II. DISCUSSION

### 1. Custodial Interrogation

The government objects to the Court's finding that the defendant was in custody when he actually submitted to the FBI agents' show of authority, which terminated or retrained the defendant's freedom of movement, and that a reasonable person in the defendant's situation would have understood that he or she was not free to leave. Filing 44 at 7. The government argues the Court erred by quoting from *Brendlin v. California*, 551 U.S. 249, 254 (2007), a Fourth Amendment case, when Fourth Amendment seizures and *Miranda* custody are two separate and distinct issues with their own standards of analysis. Filing 46 at 4.

They may be distinct issues, but they're not unrelated, either. A person is entitled to challenge the government's action under the Fourth Amendment when an officer, by means of physical force or show of authority, terminates or restrains his freedom of movement and there is actual submission by the person seized. *Brendlin*, 551 U.S. at 254. Absent a formal arrest, custody for the purposes of *Miranda* occurs under any other circumstances where a person

6

is deprived of his or her freedom of action in any significant way. *Miranda v. Arizona,* 384 U.S. 436, 444 (1966); *Berkemer v. McCarty,* 468 U.S. 420, 428 (1984); *United States v. Griffin,* 922 F.2d 1343, 1347 (8th Cir. 1990). Whether one is deprived of freedom of action in any significant way, or whether one has submitted to a show of authority that restrains that person's freedom of movement may, at the extreme margins of a hypothetical case, require consideration of whether there is a substantive distinction between seizure and custody. But that hypothetical case is not present here. This is a *Miranda* case where the Court cited the analogous Fourth Amendment decision in *Brendlin* for the unremarkable proposition that an individual's liberty may be restrained by either force or a show of authority. The government reads too much into the Court's citation.

But in any event, the standards that informed the Court's analysis of whether the defendant was in custody are the same *Griffin* indicia of custody factors that the government argues this Court failed to consider. *See* filing 44 at 7-8, filing 46 at 5-9. The testimony and evidence adduced at the suppression hearing demonstrated the following in the context of the *Griffin* indicia of custody factors. *See Griffin,* 922 F.2d at 1349.

(1) *Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest.*

No agent was able to affirmatively testify that the defendant was informed that he was free to leave, or that his participation in the questioning was voluntary. Filing 36 at 46. Both recorded interviews do not reflect that the defendant was informed that his

7

participation was voluntary or that he could leave anytime he wanted.

(2) *Whether the suspect possessed unrestrained freedom of movement during the questioning.*

The defendant did not possess unrestrained freedom. Agent Day stopped the defendant from returning to work, required the defendant to get out of his car, searched his person, confiscated the defendant's cellphone, and told him he had to wait for FBI agents who were driving from Omaha so that he could be questioned. Filing 36 at 69-70. Day also did not allow the defendant to use his own cellphone to call his employer and report that he would be late returning to work. Instead, Day required the defendant to use Day's cellphone to report to his employer that he would be late returning to work. Filing 36 at 70. Day also requested that the defendant to misrepresent the reason why he would be late returning to work. Filing 36 at 70-71; 78. When he was questioned by the agents the defendant was pinned against the agents' car and surrounded by the three agents, two of whom were within arms-length. Also present for the questioning was a task force officer who, like the two agents, was positioned within arms-length of the defendant. Filing 36 at 21-32; 78-79.

(3) *Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions.*

The defendant did not initiate contact with the agents. Day stopped the defendant and required him to wait for Hallock and Robitaille to arrive. Filing 36 at 69-70. Day confiscated the defendants' cellphone, did not allow the defendant access to his

cellphone, and never returned his cellphone after the defendant invoked his right to counsel. Filing 36 at 69-70, 76.

(4) *Whether strong arm tactics or deceptive stratagems were employed during questioning.*

The agents used a deceptive strategy to encourage the defendant to answer their questions by telling him this would be his opportunity to tell his side of the story (filing 36 at 75), when arguably, the agents' likely purpose was to obtain admissions from the defendant, if not an outright confession, that he was the source of threatening messages sent from a variety of social media accounts. This inference arises from the fact that Hallock came prepared to confront the defendant with very specific social media postings and asked the defendant to admit that he was the author of the postings and the owner of the various social media accounts. Ex. 2 at 10:45.

(5) *Whether the atmosphere of the questioning was police dominated.*

The atmosphere of the questioning was dominated by the agents. The defendant was pinned against the front of a car and surrounded by two agents and a task force officer, and with another agent standing a few feet away. Filing 36 at 21-32, 78-79. Those directly surrounding the defendant were so close they could reach out and grab the defendant. Filing 36 at 79. In the first recorded interview the defendant was told more than once that this was his opportunity to tell his side of the story (Ex. 1 at 1:26; 1:46; 2:24), and in the second recording the defendant was again encouraged to tell his side of the story. Ex. 2 at 3:26. But when the defendant's story did not directly admit the allegations that were

being investigated, Agent Hallock began confronting the defendant with social media postings, and wanted to know whether the defendant was the source of each posting. Ex. 2 at 10:45. The defendant was young, a recent high school graduate (filing 36 at 66-67), and had no criminal history indicating he would have any familiarity in dealing with law enforcement officers asking questions about alleged unlawful conduct (filing 36 at 48-49, 68). At one point in the first recording, the defendant wanted his father to be present, further indicating his lack of maturity to deal with the coercive nature of an interrogation by four federal agents. Ex. 1 2:15.

(6) *Whether the suspect was placed under arrest at the termination of the questioning.*

The defendant was placed under arrest at the end of the second recording. Filing 36 at 51. Additionally, following the first recording, after the defendant invoked his right to counsel, the agents did not tell the defendant he was free to go or return his confiscated cellphone. After the second recorded interview, the defendant believed that he would be arrested and that he was never free to leave on his own accord. Filing 36 at 75, 79-80, 89-90, 92.

The *Griffin* court reported that the six indicia of custody addressed above have been influential in the Eighth Circuit's assessment of the totality of the circumstances surrounding an official interrogation. *Griffin,* 922 F.2d at 1349. The *Griffin* court noted that for a finding of custody, the factual circumstances need not demonstrate all the indicia. *Id.* However, where all six indicia are

presented by the factual circumstances, as they are in this case, this Court's conclusion that the defendant was in custody cannot be seriously disputed.

Finally, the government misunderstands the Court's reference to the fact that Agent Hallock actually read the defendant his *Miranda* rights. The Court did not imply that by simply giving a suspect his or her *Miranda* rights, a suspect must be deemed to be in custody. The Court clearly stated that the fact Hallock read the defendant his *Miranda* rights was evidence that Hallock thought a reasonable person in the defendant's situation would not think they were free to leave. It was evidence of what a reasonable person would conclude—not, as the government suggests, proof of custody.

## 2. Invocation of Counsel

The rights for an accused in a criminal case to not be compelled to be a witness against himself and to have the assistance of counsel are secured in the Constitution "for the ages to come, and . . . designed to approach immortality as nearly as human institutions can approach it." *Cohens v. State of Virginia,* 19 U.S. 264 (1821); *Miranda,* 384 U.S. at 442. When an accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda,* 384 U.S. at 444-45. Even if an accused has answered some questions, the accused continues to maintain "the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Miranda* 384 U.S. at 445.

The Court in *Edwards v. Arizona,* 451 U.S. 477 (1981), addressed additional safeguards that were necessary to protect a suspect's rights if he had previously invoked a right to the assistance of counsel.

> [W]e now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

(Emphasis supplied) *Edwards*, 451 U.S. at 484-85. Citing the text emphasized above, the Court in *Minnick v. Mississippi,* 498 U.S. 146, 151 (1990), noted that *Edwards* was designed to prevent badgering a suspect into waiving his previously asserted right to counsel or to remain silent. "[O]fficials may not *reinitiate* questioning 'until counsel has been made available' to him." (Emphasis supplied) *Minnick,* 498 U.S. at 147.

      Where there has been no break in custody after an accused's invocation of the right to counsel but before counsel is actually provided, there can be no break in the presumption that the accused considers himself unable to deal with the pressures of a custodial interrogation without the assistance of counsel, even where the accused is approached by law enforcement about a separate investigation. *Arizona v. Robertson,* 486 U.S. 675, 683 (1988). The Court in *Maryland v. Shatzer,* 559 U.S. 98 (2010), emphasized again the need for a break in custody to assure that any "change of heart is less likely attributable to 'badgering' than it is to the fact that further deliberation in familiar surroundings" caused the suspect to believe that cooperating with the investigators was in the suspect's interests. *Id.* at 108.

> The protections offered by *Miranda*, which we have deemed sufficient to ensure that the police respect the suspect's desire to have an attorney present the first time police interrogate him, adequately ensure that result when a suspect who initially requested counsel is reinterrogated after a break in custody that is of sufficient duration to dissipate its coercive effects.

*Id.* at 109.

Here, when the defendant invoked his right to the assistance of counsel, Agent Hallock stopped recording, but by his own admission, Hallock did not stop conversing with the defendant about the matter at hand. Although Hallock said he could not recall verbatim what he told the defendant after he stopped the first recording, he believed he said something to the effect that the defendant would have a chance to tell his side of the story in a proffer once he obtained counsel, and that cooperative defendants have a chance to get some consideration as compared to uncooperative defendants. Filing 36 at 14.

The defendant recalled one of the agents saying in a loud voice, "That's all right, but this is going to end tonight." Filing 36 at 76. The defendant testified that after he heard the agent's comment, he thought he had to do the second interview because of the emphasis that was put on cooperation as opposed to uncooperative defendants. *Id.* Neither Hallock or Day contradicted the defendant's testimony about an agent saying it was going to end tonight. Moreover, Hallock testified that in the recordings he did not tell the defendant that the interview was voluntary, or that he could walk away anytime he wanted. Hallock also could not recall whether he informed the defendant that the interview was voluntary before the recordings started. Filing 36 at 46.

Agent Hallock said he did not make his comments about a proffer and cooperation to get the defendant to change his mind and make a recorded

13

statement. Hallock said he did it to "assist him in the process." Filing 36 at 14. And although the Court accepts Agent Hallock at his word, the defendant did not invoke a right to have an FBI agent assist him in the process. The defendant invoked his Constitutional right to deal with the FBI agents with the assistance of counsel. Notwithstanding Agent Hallock's intent, he still should have reasonably known that the comments he and the other agents made to assist the defendant in the process were reasonably likely to induce the defendant to change his mind and cooperate with Hallock's request for a recorded interview and make incriminating admissions. *See Rhode Island v. Innis*, 466 U.S. 291, 300-01 (1980). The focus of whether an officer's comments are reasonably likely to elicit an incriminating response primarily relies on the perceptions of the person in custody. *Id.* Here, the defendant testified that he felt he needed to give Hallock a recorded statement upon hearing what the agents said after Hallock had stopped the first recording when the defendant invoked his right to counsel. Filing 36 at 76.

There is an absence of evidence that would allow this Court to conclude that the defendant's "change of heart is less likely attributable to 'badgering' than it is to the fact that further deliberation in familiar surroundings has caused him to believe (rightly or wrongly) that cooperating with the investigation is in his interest." *Shatzer* 559 U.S. at 108. Although "badgering" is not a word this Court would use to describe the agents' conduct, the agents did continue to converse with the defendant in ways that they should reasonably have known, and which in fact did, effectively influence the defendant's decision whether to submit to an interview after first invoking his right to deal with the agents only with the assistance of counsel.

The government argues that after the first recording stopped, the agents prepared to leave without placing the defendant under arrest, but then the

14

defendant initiated a further conversation with the agents. Filing 46 at 9-11. However, the evidence, including Agent Hallock's testimony, does not support the government's argument. Hallock, by his own admission, continued conversing with the defendant to "assist him in the process." And, the defendant testified that he thought he had to consent to the second interview after being told that "this is going to end tonight." The defendant could not initiate a subsequent contact and interview when the original contact and interview never concluded. And even though Hallock testified that after the first recording ended, he and the other agent prepared to leave without arresting the defendant (filing 36 at 53), he never communicated the agents' plan to the defendant. Hallock cannot recall advising the defendant that he was free to go, nor did the agents return the defendant's confiscated cellphone. The defendant believed that when the agents left, he would be leaving with them, but under arrest. Filing 36 at 90. The Court concludes that the defendant's belief was reasonable given all that the agents did and said, and given all that they didn't do or say.

### 3. Consent to Search Cellphone

This Court found that the defendant did not voluntarily consent to the seizure or search of his cellphone, and suppressed all statements made after the defendant invoked his right to counsel, as well as any evidence obtained pursuant to a search of the defendant's cellphone. Filing 44 at 12. The defendant's consent to the search of his cellphone was involuntary because it was obtained after he invoked his Fifth Amendment right to deal with law enforcement through an attorney. The government's argument for reconsideration is predicated on its assertion that the defendant waived his previous invocation of the right to counsel when he initiated further contact

with the agents. The government also argues that, considering the totality of the circumstances, the defendant voluntarily consented to the seizure and search of his cellphone after receiving a second *Miranda* warning. Filing 46 at 15-19.[1]

As detailed in the previous sections, the Court rejects the government's premise that the defendant initiated further contact with the agents. The defendant invoked his right to counsel indicating that he was unable to cope with the pressures of a custodial interrogation on his own. The agents, however, continued to converse with the defendant about the possibility of a proffer, that suspects who cooperate are better off than suspects who are uncooperative, and that everything would end tonight. Hallock said his comments were intended to assist the defendant in the process, but it was not Agent Hallock's assistance that the defendant requested. Hallock and the other agents reasonably should have known that their comments to the defendant were reasonably likely to induce incriminating admissions from the defendant.

---

[1] The government refers in passing to the rule that "a violation of the *Miranda* rule does not justify the suppression of physical evidence that is the fruit of custodial interrogation conducted without *Miranda* warnings." *United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013). The argument is not developed, but to the extent the government makes it, reliance on that proposition is misplaced. The argument is based on the holding that the Self-Incrimination Clause "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements." *United States v. Patane*, 542 U.S. 630, 637. (2004). In other words, physical evidence may be admitted where it resulted from statements that were voluntary, but not preceded by *Miranda* warnings. That's the opposite of this case. Here, the defendant was given *Miranda* warnings, but his invocation of counsel was not respected, and as such, both the defendant's statements and his consent to search his cellphone were involuntary.

*Innis*, 446 U.S. at 300. The agents, by continuing the conversation with the defendant, would "surely exacerbate whatever compulsion to speak" the defendant may have been feeling, and as a result, induce the defendant to consent to the search of his cellphone. *Robertson* 486 U.S. at 686.

This Court cannot conclude that a "fresh set of *Miranda* warnings" would assure the defendant that the invocation of his right to counsel a second time would have been honored to any degree whatsoever, when invocation of his right to counsel was ignored before. *See id.* Having failed to observe the defendant's invocation of his right to counsel, the defendant's subsequent consent to allow the agents to seize and search his cellphone was involuntary pursuant to *Miranda, Edwards, Roberson, Minnick,* and *Shatzer*.

Finally, the only evidence that the government presented at the suppression hearing concerned the defendant's consent to the seizure and search of this cellphone. Moreover, the Magistrate Judge only addressed whether the defendant's consent for the seizure and search of his cellphone was voluntary. Accordingly, this Court has only considered the issue of voluntary consent in ruling that the evidence obtained as a result of the cellphone seizure and search must be suppressed.

The government did not adduce evidence indicating that there was another lawful basis for admission of evidence obtained from the defendant's cellphone. For instance, inevitable discovery—specifically raised by the government now (filing 46 at 19)—is a doctrine that must be proved by the government by a preponderance of the evidence. But the government has not made an effort to do so, either before the magistrate judge or before this Court in support of it motion for reconsideration.

The answer to the government's request for "the opportunity to present an argument and evidence" on such other issues is for the government to file

an appropriate motion to determine the admissibility of the evidence, which can then be referred to the Magistrate Judge for the parties to adduce evidence and argument. Only then may this Court consider an alternate basis to deny the defendant's motion to suppress the evidence obtained from a search of the defendant's cellphone.

IT IS ORDERED the government's motion for reconsideration ([filing 45](filing 45)) is denied for the reasons stated herein.

Dated this 6th day of August, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge